**IN THE UNITED STATES DISTSRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEAST DIVISION**

| | | | |
|---|---|---|---|
| **JEREMY JAMES DALTON,** | ) | | |
| **Plaintiff,** | ) | | |
| | ) | **Case No. 2:19-cv-00085** | |
| **v.** | ) | **Chief Judge Crenshaw / Frensley** | |
| | ) | | |
| **SOUTHERN HEALTH PARTNERS,** | ) | | |
| **Defendant.** | ) | | |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION AND BACKGROUND

This matter is before the Court upon Plaintiff's Motion to Amend his Complaint (Docket No. 42), Plaintiff's Motion for Summary Judgment (Docket No. 20), and Defendant's Motion for Summary Judgment (Docket No. 36).

#### A.    Plaintiff's Motion to Amend his Complaint

As an initial matter, Plaintiff filed his Complaint in this action on November 4, 2019, alleging violations of his Eighth and Fourteenth Amendment rights. Docket No. 1. Specifically, Plaintiff avers that he was initially told that he would only receive treatment for cirrhosis of the liver, rather than for his Hepatitis C, but Plaintiff acknowledges that he was seen by a specialist on August 1, 2019, who did bloodwork to begin to identify "which strain" of Hepatitis C Plaintiff had. *Id.* Plaintiff avers that the specialist informed Plaintiff that he should return in one month for further bloodwork and that he should begin a course of medication, but that such medication was subject to approval of the Jail. *Id.* Plaintiff maintains that as of October 2019, he had not yet received the "cure." *Id.* Plaintiff seeks an order requiring Defendant to treat his Hepatitis C; a ruling that an incarcerated person may obtain copies of medical tests and treatment, including psychological exams and medications, without an attorney; a ruling "as to the right to obtain

[certain health care provider information]'" a ruling regarding a county's liability to ensure necessary funding to provide cures to diseases; and a ruling as to "affirmative action by a county to obtain [certain] medical grants." *Id.*

On November 25, 2019, Plaintiff filed a Motion to Supplement his Complaint. Docket No. 5. In his Motion to Supplement, Plaintiff avers that, since he filed his Complaint, he has seen Defendant's medical staff, undergone multiple blood tests, and was "assured that [he] would receive the cure" for his Hepatitis-C. *Id*. Plaintiff maintains that because he was not given "the cure," Defendant disregarded his serious medical needs so as to amount to deliberate indifference. *Id.* Plaintiff seeks damages and also states that the Motion to Supplement is "in no way intended to disturb or diminish" his original claims and demands for relief. *Id.*

On April 9, 2020, Plaintiff filed a Motion to Amend his Complaint, seeking to represent a class action. Docket No. 13. Also on April 9, 2020, Plaintiff filed a Motion to Join Fentress County as a Defendant in this action. Docket No. 15.

On April 28, 2020, the undersigned denied these Motions. Docket No. 23.

As will be discussed in greater detail below, Plaintiff filed his Motion for Summary Judgment on April 24, 2020 (Docket No. 20), and Defendant filed its Motion for Summary Judgment on June 8, 2020 (Docket No. 36).

Thereafter, on June 15, 2020, Plaintiff filed the instant Motion to Amend. Docket No. 42. Plaintiff's Motion to Amend reiterates earlier contentions and raises new allegations against the Jail staff, specifically the Jail Administrator and Assistant Jail Administrator. *Id*. Additionally, Plaintiff avers that, on May 18, 2020, he was moved from the Fentress County Jail to the Grundy County Jail "amid strict COVID-19 mandates," which were "supposed to prevent such moving until this plague got under control." *Id.* Plaintiff states that he was again moved to a new Jail on

May 26, 2020. *Id.* Plaintiff avers that the Jail moves were an intentional delay, denial of medical care, and deliberate indifference. *Id.*

Defendant has filed a Response in Opposition to the instant Motion to Amend, arguing that Plaintiff's Motion to Amend should be denied because: (1) it is futile because Plaintiff has failed to allege that any injury he suffered is the result of Defendant's official policy or custom; (2) it is further futile because the law is well-settled that inmates have no constitutional right to be incarcerated in any particular institution such that he cannot recover for the transfer to other jail facilities; (3) it is untimely and would cause prejudice to Defendant in the form of additional time and expense investigating new factual allegations, preparing, and filing additional motions since Defendant has filed a Motion for Summary Judgment and all accompanying material based upon Plaintiff's allegations and claims already proffered, and (4) it is further untimely and would cause prejudice to Defendant in the form of additional time and expense investigating new factual allegations, preparing, and filing additional motions since Defendant has filed a Response to Plaintiff's Motion for Summary Judgment that was based upon the allegations and claims for relief Plaintiff proffered. Docket No. 45.

Significantly, the only remaining Defendant in this action is Southern Health Partners. Docket No. 6. Neither the Jail, the Jail Administrator, nor the Assistant Jail Administrator is a Defendant in this matter. Accordingly, because the amendments Plaintiff seek relate to actions or inactions allegedly related to the Jail, the Jail Administrator, and the Assistant Jail Administrator, and none of them is a party to this action, Plaintiff's sought amendments are futile, and Plaintiff's Motion to Amend is hereby DENIED.

The undersigned will therefore consider the pending cross-Motions for Summary Judgment as they have been filed.

### B.     Plaintiff's Motion for Summary Judgment

On April 24, 2020, Plaintiff filed the pending Motion for Summary Judgment. Docket No. 20. As ground for his Motion, Plaintiff states:

> Plaintiff avers Southern Health Partners cannot produce any real material proof as to it being medically unadvisable to initiate treatment for Hepatitius-C [*sic*], and that no issue in need, nor issue in duty to supply such need can be disputed, and that, only cost is preventing such treatment for Hepatitus-C [*sic*] as the cure is fairly expensive, wherein which is, why Plaintiff does now seek summary judgment.

*Id.*

Plaintiff did not file a supporting Memorandum of Law.[1]

Plaintiff filed a document entitled "Statement of Material Fact,"[2] which states in its entirety:

> 1.      Southern Health Partners is a contracted healthcare provider for the inmates of Fentress County Jail. Reference Answer to Complaint IV.1.
> 2.      Plaintiff Jeremy James Dalton has Hepatitus-C [*sic*]. See Attached Affidavit.
> 3.      Plaintiff Jeremy James Dalton as a ward of Southern Health Partners by virtue of incarceration at the Fentress County Jail as a pre-trial detainee. See Answer to Complaint II.
> 4.      No medication, no treatment to combat this disease has been realized, whatsoever, by Plaintiff Jeremy James Dalton to date. See Affidavit Attached.
> 5.      Blood testing, physical examination, ultrasounds, are only able to confirm and ascertain the status of any medical problem and are not "treatments." See Affidavit Attached.
> 6.      If a disease is identified within a human being and many different cures exist for that disease, wouldn't common sense, ethical standard, and basic human right to life dictate, that one such cure, for that disease, would be the only adequate treatment, and indeed, the only treatment sought at all by anyone? See Affidavit Attached.

Docket No. 21., pp. 1-2.

---

[1] Plaintiff's failure to file a supporting Memorandum of Law violates Local Rule 7.01(a)(2), which states in pertinent part: "Except as otherwise provided herein, every motion that may require the resolution of an issue of law must be accompanied by a separately filed memorandum of law citing supporting authorities and, where allegations of fact are relied upon, affidavits, depositions, or other exhibits in support thereof."

[2] Plaintiff's "Statement of Material Fact" is not in a form required by Fed. R. Civ. P. 56.

4

Plaintiff also filed a document entitled "Unsworn Declaration of Truth (Affidavit)," which states in its entirety:

> I, Jeremy James Dalton, have in my possession, records from the health department that proves, beyond doubt, I have Hepatitus-C [*sic*].

> I have been tested numerous times by Southern Health Partners, have had an ultrasound and also had a treatment plan developed with the cure as treatment, by a specialist in Cookeville that I saw because Southern Health Partners sent me there to initiate treatment for Hepatitus-C [*sic*]. The Health Department, prior to arrest did wish to initiate treatment with the cure also.

> I have received no treatment, no medication, and no real response to combat this disease by Southern Health Partners, whatsoever.

> I, Jeremy James Dalton, do gave [sic] this unsworn declaration of fact under penalty of perjury and judgment that comes from almighty God, hereafter, on this April 18th, so help me God.

*Id.*, p. 3.[3]

Defendant has filed a Response to Plaintiff's Motion and a Response to Plaintiff's "Statement of Material Fact." Docket Nos. 39, 39-1.

In Defendant's Response to Plaintiff's Motion for Summary Judgment, Defendant argues that Plaintiff's Motion should be denied: (1) because Plaintiff's Complaint seeks only declaratory and injunctive relief and Plaintiff has been transferred from the custody of the Fentress County Jail to the Grundy County Jail, such that his claims are moot; (2) Plaintiff has failed to exhaust his administrative remedies, as required under the Prison Litigation Reform Act, 42 U.S.C. §1997e(a), such that his Motion must be denied; (3) Plaintiff has presented no evidence in support of his Motion, other than his own unsupported, conclusory "Unsworn Declaration"; and (4) Defendant has provided affirmative evidence that it is medically inadvisable to initiate Hepatitis C treatment for Plaintiff at this time. Docket No. 39.

---

[3] Plaintiff's "Unsworn Declaration of Truth (Affidavit)" is not in a form required by Fed. R. Civ. P. 56.

As to Plaintiff's "Statement of Fact," Defendant responds that Plaintiff has been transferred from Fentress County Jail to Grundy County Detention Center and that Defendant provided Plaintiff with medical treatment while he was an inmate in the Fentress County Jail by obtaining diagnostic tests and by monitoring Plaintiff's Hepatitis C. Docket No. 39-1. Defendant further responds that blood testing, physical examination, and ultrasound testing are diagnostic tools used by healthcare providers in the course of providing medical treatment. *Id.*

Also in response to Plaintiff's Motion, Defendant has submitted its own Concise Statement of Undisputed Facts, the Declaration of Nerissa Lowe, LPN, the Declaration of Casey Dillon, PA, the Declaration of Kenneth Mathews, MD, the Declaration of Candy Price, and Plaintiff's Sealed Jail Medical Records. Docket No. 39-2.

### C.     Defendant's Motion for Summary Judgment

Defendant filed its own Motion for Summary Judgment, arguing that there are no genuine issues as to material fact and that it is entitled to a judgment as a matter of law because Plaintiff's Motion is moot since he has been transferred to another facility and his Complaint seeks only declaratory and injunctive relief, and because he has failed to exhaust his administrative remedies prior to filing suit. Docket Nos. 36, 37. Defendant also argues that the undisputed evidence establishes that its medical staff provided appropriate care and treatment for Plaintiff's Hepatitis C. *Id.*

Along with its Motion, Defendant contemporaneously filed a supporting Memorandum of Law, a Concise Statement of Undisputed Facts, the Declaration of Nerissa Lowe, LPN, the Declaration of Casey Dillon, PA, the Declaration of Kenneth Mathews, MD, the Declaration of Candy Price, and Plaintiff's Sealed Jail Medical Records. Docket Nos. 36 – 38-6.

Plaintiff has not responded to Defendant's Motion or to Defendant's Concise Statement of

Undisputed Facts.

For the reasons to be discussed below, the undersigned finds that allowing Plaintiff to Amend his Complaint at this juncture would not only be futile, but it would cause an undue burden on Defendant, as the pending cross-Motions for Summary Judgment and supporting materials have already been filed. Accordingly, Plaintiff's Motion to Amend (Docket No. 42) will be DENIED.

Additionally, for the reasons to be discussed below, the undersigned also finds that Plaintiff has failed to exhaust his administrative remedies, as required under the PLRA. The undersigned further finds that even if Plaintiff had exhausted his administrative remedies, there are no genuine issues of material fact and Defendant is entitled to a judgment as a matter of law. Accordingly, the undersigned recommends that Defendant's Motion for Summary Judgment (Docket No. 36) be GRANTED and that Plaintiff's Motion for Summary Judgment (Docket No. 20) be DENIED.

## II. UNDISPUTED FACTS[4]

### A. Declaration of Nerissa Lowe, LPN

Nurse Lowe obtained her LPN degree from the Fentress County Board of Education Licensed Practical Nursing Program in 1991. Docket No. 38-2, ¶ 2. Nurse Lowe has been licensed as a nurse by the State of Tennessee since 1991. *Id.*

Health care in the Fentress County Jail ("Jail") is provided under the direction of a Medical Team Administrator ("MTA"), as well as a Medical Director. *Id.*, ¶ 3. From September 25, 2017 to the present, Nurse Lowe has been the MTA. *Id.* When Plaintiff was booked into the Jail on September 4, 2018, the Medical Director was Trent Dority, NP. *Id.* Lanita Gann, FNP, was the

---

[4] As discussed above, neither Plaintiff's "Statement of Material Fact" nor "Unsworn Declaration of Truth (Affidavit)" is in a form required by Fed. R. Civ. P. 56. Accordingly, the undersigned will not include them in this section, as the following Facts are in a form required by Fed. R. Civ. P. 56 and are undisputed.

Medical Director from October 31, 2018 to December 7, 2018. *Id.* From December 7, 2018 to the present, Casey Dillon, PA, has been the Medical Director. *Id.*

When an inmate requires routine medical care, he or she obtains an inmate "sick call slip" from the corrections officer on duty in the housing unit and that slip is completed and then provided to the medical staff for action. *Id.*, ¶ 4. Routine sick calls are conducted by medical staff inside the housing unit. *Id.*

Plaintiff was booked into Jail on September 4, 2018 for charges of aggravated assault, attempted homicide, attempted vandalism, and assault. *Id.*, ¶ 5.

On September 5, 2018, at 9:00 am, Nurse Lowe observed that Plaintiff had been placed into a padded cell by corrections officers because he was experiencing hallucinations. *Id.*, ¶ 6. The corrections officers had notified Crises Services and Crises Services placed Plaintiff on a waiting list to be transferred to Moccasin Bend Mental Health Institute ("Moccasin Bend") for inpatient psychiatric treatment. *Id.* Nurse Lowe observed and noted that Plaintiff was alert, but not oriented, and that he was banging on the cell door. *Id.* He was not making threats to harm himself, but he was making threats to harm others. *Id.*

On September 6, 2018, Nurse Lowe observed that Plaintiff was still in the padded cell but did not appear to be in any distress. *Id.*, ¶ 7. Nurse Lowe was advised by corrections officers not to go into the room for safety reasons due to the seriousness of Plaintiff's charges and his threats to harm others. *Id.*

On September 7, 2018, Nurse Lowe observed Plaintiff from outside the cell door. *Id.*, ¶ 8. Nurse Lowe noted that Plaintiff was continuing to experience hallucinations, but was not in distress, and appeared calmer. *Id.* Nurse Lowe noted that Plaintiff was still awaiting transport to Moccasin Bend. *Id.*

On September 10, 2018, Plaintiff was transported by corrections officers to Moccasin Bend. *Id.*, ¶ 9. Plaintiff was diagnosed with methamphetamine induced psychotic disorder, unspecified personality disorder with antisocial traits, opioid use disorder, cannabis use disorder, hallucinogen use disorder, tobacco use disorder, Hepatitis C, multiple superficial lacerations and abrasions, weight loss, and a laceration on the right forearm. *Id.*

Plaintiff was discharged from Moccasin Bend on September 12, 2018. *Id.*, ¶ 10. His discharge documents included medical orders for Lithium, 300 mg orally, two times per day. *Id.*

Plaintiff was returned to the Jail on September 13, 2018. *Id.*, ¶ 11. Nurse Lowe observed and noted that Plaintiff was alert, oriented, and pleasant. *Id.* Nurse Lowe contacted the Medical Director, who issued medical orders for Lithium 300 mg twice per day. *Id.*

On September 13, 2018, Plaintiff submitted a Grievance Form which stated:

> 1.    Inmates are not receiving adequate medical attention here. I went to see the nurse the other day with the Flu and she said there was nothing wrong with me. That was after waiting two or three days after my request to see her. Other people like George Langley who has a lot of swelling on his elbow that looks nasty can't even get an ibuprofen. I received one dose for 5 dollars. I receive migraine headache medicine the last time I was here the whole time almost and now she said she can't give it. Did your medical provider change? Why can I have it then and not now? It's documented as a medical problem of mine here why can't I get medical for it? I'm supposed to have my 3 hepatitis shot this month and she is refusing that also. She is purposely refusing to help to save money. P.S. charging inmates for no help is also [a] big no no!

*Id.*, ¶ 12.

On September 14, 2018, at about midnight, Nurse Lowe was contacted by a corrections officer, who reported to her that Plaintiff's blood pressure was 130/100. *Id.*, ¶ 13. Nurse Lowe instructed the officer to move Plaintiff to the medical segregation cell and monitor his blood pressure. *Id.* At 3:25 am, Nurse Lowe was notified that Plaintiff's blood pressure had decreased to 120/80. *id.*

On September 14, 2018, at 9:00 am, Plaintiff refused to take his Lithium. *Id.*, ¶ 14. Plaintiff

stated, "I don't want it anymore," "It caused my BP to go up." *Id.* He added, "I'm allergic to it anyway." *Id.*

On September 15, 2018, Plaintiff again refused to take his medication. *Id.*, ¶ 15. Plaintiff signed a Refusal of Medical Treatment form confirming his refusal. *Id.*

On September 15, 2018, Nurse Lowe received a copy of Plaintiff's grievance from September 13th. *Id.*, ¶ 16. Nurse Lowe responded in writing to each of Plaintiff's complaints. *Id.* Nurse Lowe signed her response and provided it to the Jail Administrator. *Id.*

To Plaintiff's complaint regarding the flu, Nurse Lowe responded, "Mr. Dalton was seen on 10/12/18[5] with complaints of flu symptoms, headache, and sore throat. This inmate's condition at the time of exam did not correspond with his history given. Vital signs were stable, and no fever was noted. My assessment of inmate did not justify giving him any antibiotics at time of assessment. Inmate was given Ibuprofen 400 mg for complaints of headache." *Id.*, ¶ 17. To Plaintiff's complaint regarding the other inmate with swelling on his elbow, Nurse Lowe responded, "I am not at liberty to discuss other inmates' medical condition with Mr. Dalton. This is considered a HIPPA violation. If any inmate has a medical issue, they have the opportunity to send in a sick call request to be seen by the nurse or the medical provider." *Id.*, ¶ 18.

About Plaintiff's complaint regarding migraine medicine, Nurse Lowe responded, "Any prescription medication cannot be given without a current medical record with medication given and a diagnosis by a Medical Doctor on file. Mr. Dalton can put in a request to nurse in order to obtain current medical records from his Doctor showing what medication that is being prescribed and this will be reviewed." *Id.*, ¶ 19. Regarding Plaintiff's complaint that he had not received his Hepatitis B vaccine, Nurse Lowe responded, "I did not refuse to give. Mr. Dalton his 3rd Hepatitis

---

[5] This appears to be a typographical error. It appears that Defendant was referring to 9/12/18.

B vaccine. I instructed Mr. Dalton that Pat from the FCHD would be coming soon and she would administer the vaccine at that time." *Id.*, ¶ 20. To Plaintiff's complaint about being charged for medical services, Nurse Lowe responded, "It is posted that the cost to see the Nurse is $10.00 and if any mediation is needed then it is additional $5.00 per prescription. Inmates are only charged for the services rendered and are NEVER refused treatment." *Id.*, ¶ 21.

On September 17, 2018, Plaintiff requested to discontinue his Lithium, stating, "I don't want it. It caused my BP to spike." *Id.*, ¶ 22. Nurse Lowe informed Plaintiff that his blood pressure had only been elevated to 130/100 on one occasion and had been within normal limits afterward. *Id.* Nurse Lowe pointed out that Plaintiff had been given Lithium while at Moccasin Bend, with no issues. *Id.* Plaintiff signed a Refusal of Medical Treatment form, indicating that he was refusing Lithium. *Id.*

On September 17, 2018, Nurse Lowe contacted Trent Dority, the Medical Director, who issued medical orders to discontinue the Lithium. *Id.*, ¶ 23.

On September 18, 2018, Nurse Lowe noted that according to the Moccasin Bend records, Plaintiff was due for a Hepatitis B vaccine on October 8, 2018. *Id.*, ¶ 24. Nurse Lowe made arrangements for the Fentress County Health Department to provide Plaintiff with the vaccine. *Id.*

On September 29, 2018, Plaintiff submitted a sick call request, stating that he had a cut on the bottom of his foot. *Id.*, ¶ 25. On October 1, 2018, Nurse Lowe received Plaintiff's sick call request and saw him in the Jail medical the next day, on October 2, 2018. *Id.*, ¶ 26. Nurse Lowe noted that Plaintiff's blood pressure was 110/78, pulse was 96, respirations were 18, oxygen saturation was 98%, and temperature was 97.2. *Id.* Plaintiff's skin was warm and dry, his pupils were equal and reactive, and his respirations were even. *Id.* He was calm, alert, and oriented, with a stead gait. *Id.* Nurse Lowe observed and noted that Plaintiff had a small cut on the heel of his

left foot, of approximately one centimeter. *Id.*, ¶ 27. There was no active bleeding, no signs of infection, no fever, redness, or edema. *Id.* Nurse Lowe provided Plaintiff with antibiotic ointment and Band-Aids. *Id.* Pursuant to medical orders from the Medical Director, Nurse Lowe provided Plaintiff with Motrin, 200 mg twice per day for three days. *Id.*

On October 2, 2018, Plaintiff inquired about his Hepatitis B vaccine. *Id.*, ¶ 28. Nurse Lowe informed him that someone from the Fentress County Health Department would give him the vaccine when they came to the Jail. *Id.* Nurse Lowe also informed Plaintiff that it was okay if he did not get the vaccine by October 8, 2018. *Id.* Plaintiff stated that he understood. *Id.*

On October 9, 2019, Plaintiff submitted a sick call request, stating, "Bad headache/ congested/throat sore flue [*sic*] symptoms." *Id.,* ¶ 29. Nurse Lowe received Plaintiff's sick call request on October 10, 2018. *Id.*, ¶ 30.

On October 12, 2018, Nurse Lowe saw Plaintiff in the Jail medical office. *Id.*, ¶ 31. Plaintiff stated that he had experienced a headache, cough, and congestion for four days. *Id.* Nurse Lowe observed and noted that Plaintiff's blood pressure was 100/74, pulse was 88, respirations were 18, oxygen saturation was 97%, and his temperature was 97.9. *Id.* Plaintiff's skin was warm and dry, he was calm, cooperative, alert and oriented, with a steady gait. *Id.* His pupils were equal and reactive, and his respirations were unlabored. *Id.* He had no fever, his lungs were clear, tympanic membranes were good, and there was no redness or edema in his throat. *Id.* Pursuant to medical orders, I provided Plaintiff with Motrin 400 mg in a single dose. *Id.*

On October 13, 2018, Plaintiff filed a grievance with the Sheriff's Department, which stated:

> 1.      Inmates are not receiving adequate medical attention here. I went to see the nurse the other day with the flu and she said there was nothing wrong with me. That was after waiting two or three days after my request to see her. Other people like [ ] Langley who has a lot of swelling on his elbow that looks nasty can't even get an

ibuprofen. I received one dose for 5 dollars. I receive migraine headache medicine the last time I was here the whole time almost and now she said she can't give it. Did your medical provider change? Why can I have it then and not now? It's documented as a medical problem of mine here why can't I get medical for it? I'm supposed to have my 3 hepatitis shot this month and she is refusing that also. She is purposely refusing to help to save money. P.S. charging inmates for not help is also [a] big no no!

*Id.*, ¶ 32.

On October 25, 2018, the Fentress County Health Department came to the Jail and administered Plaintiff's third Hepatitis B vaccination. *Id.*, ¶ 33.

On January 2, 2019, Nurse Lowe was notified that Plaintiff was to undergo a court-ordered forensic evaluation through the Moccasin Bend Mental Health Institute. *Id.*, ¶ 34. On January 31, 2019, Plaintiff was admitted to Moccasin Bend for a forensic evaluation. *Id.*, ¶ 35.

On February 21, 2019, Rachel Appleby, NP, the mental health examiner at Moccasin Bend, noted that Plaintiff had presented with paranoid delusions, auditory hallucinations, physical aggression, and polysubstance abuse. *Id.*, ¶ 36. She reported no physical aggression and no symptoms of psychosis. *Id.* She diagnosed Plaintiff with Amphetamine-induced psychotic disorder, opioid use disorder, methamphetamine use disorder, antisocial personality disorder, other hallucinogen use disorder, tobacco use disorder, Hepatitis C, and cannabis use disorder. *Id.* In her opinion, Plaintiff was competent to stand trial, and there was no support for an insanity defense. *Id.*

Blood tests conducted at Moccasin Bend indicated AST (SGOT) of 52, and ALT (SGPT) of 109. *Id.*, ¶ 37. On February 22, 2019, Plaintiff was discharged from Moccasin Bend and returned to the Jail. *Id.*, ¶ 38.

On May 5, 2019, Plaintiff submitted a sick call slip, stating, "Can I see the doctor about my hepatitis? When should I have my levels checked again? Can I get the HARVONI while I'm

here?" *Id.*, ¶ 39. On May 6, 2019, Nurse Lowe responded to Plaintiff's sick call request by noting that Plaintiff would be seen by the Medical Director at his next jail visit. *Id.*, ¶ 40.

On May 23, 2019, PA Dillon saw Plaintiff in the Jail medical office. *Id.*, ¶ 41. Plaintiff demanded treatment for Hepatitis C. *Id.* Plaintiff stated, "I know this guy named 'Darr' is getting treatment and you prescribed it." *Id.* PA Dillon informed Plaintiff that it would be a HIPPA violation to disclose any medical information about another patient. *Id.* Plaintiff became very rude and obnoxious, and again requested that PA Dillon treat him for Hepatitis C. *Id.* PA Dillon noted that Plaintiff had a history of intravenous drug use. *Id.* Also, on May 23, 2019, PA Dillon noted that Plaintiff was alert and oriented, his head, ears, eyes, and nose were clear, with no yellowing of the sclerae or skin. *Id.*, ¶ 42. PA Dillon noted that there was no laboratory confirmation in Plaintiff's medical chart that he had ever been diagnosed with Hepatitis C. *Id.* He informed Plaintiff that Hepatitis C treatment would require consultation with a specialist and approval from Defendant and Fentress County. *Id.* He cautioned Plaintiff that there was no guarantee that the requested treatment would be provided. *Id.* Plaintiff then demanded that PA Dillon prescribe him the medication Motrin. *Id.* PA Dillon informed Plaintiff that it was not advisable for him to take Motrin because this medication carries a risk of accelerating liver cirrhosis in higher doses. *Id.*

On May 23, 2019, Plaintiff stormed out of the door of the medical office and stated that he would file a lawsuit against the nurse practitioner and the nurse. *Id.*, ¶ 43.

On May 24, 2019, Nurse Lowe encountered Plaintiff at the doorway of his pod during medication pass. *Id.*, ¶ 44. Plaintiff was handing some paperwork to a corrections officer. *Id.* The document stated, "I have been refused medical treatment." *Id.* Nurse Lowe verbally informed Plaintiff that he had not been denied medical treatment, and that discussions were underway about whether to initiate medical treatment for his Hepatitis C. *Id.* Nurse Lowe also informed Plaintiff

that he would be given no medications such as ibuprofen that were metabolized by the liver because of his suspected Hepatitis C. *Id.* Also, on May 24, 2019, Nurse Lowe observed that Plaintiff was alert and oriented, his skin color was normal, the sclerae of both eyes were white, with no yellowing, and he appeared in no distress. *Id.*, ¶ 45.

Additionally on May 24, 2019, Plaintiff submitted a Grievance Form which stated, "On 5/23/2019, I, Mr. Jeremy Dalton did see the 'Ghost Doctor' and the Nurse Marissa about obtaining of treatment for a disease that is killing me and was refused medical treatment of any kind including but not limited to further testing as to surmise the severity of my medical need of treatment from which civilized measure at life's necessity may be derived as well as proper course of action for treatment. Deliberate indifference was shown by the fact that the 'Ghost Doctor' refused to give his name when he learned of my intention to ask the court if his action was correct and also by the fact that this same medication needed by me has been prescribed to other inmates for rashes caused by dysfunction of liver due to worsening of disease." *Id.*, ¶ 46.

Still additionally on May 24, 2019, Plaintiff submitted an "Inmate Request," stating "Nurse Marissa, I have talked to Darr, and have found out that I as wrong in my understanding that he received the Harvoni. Apparently the "Ghost Doctor" told him that it was the generic Harvoni which is what led to the problem. I apologize for any undue crap I may have caused you for my mistake but I would still like to grieve the issue as I do believe there ought to be some relief to be had as it is a cure and I do have the disease that is continuing to get worse and to wait until I contract cirrhosis of the liver before I receive the needed medication seems a bit ridiculous to me as it would then be to [*sic*] late as the final stages would have begun. What about interferon? That is the old kind of treatment. Is that possible to get? If I need to rewrite my grievance for my mistake I will or you can attach this to it as I will still be pursuing legal possibility of obtaining the cure as

the law and many constitutional articles and amendments do give me the right to life if there is a cure to a disease I have and I will seek this as my right is. Once again forgive me for my Mistake as lies have caused yet another unnecessary problem." *Id.*, ¶ 47.

On May 30, 2019, PA Dillion issued medical orders for additional laboratory testing for Plaintiff to determine whether Plaintiff had cirrhosis. *Id.*, ¶ 48. Also on May 30, 2019, Nurse Lowe provided a written response to Plaintiff's grievance of May 24, 2019. *Id.*, ¶ 49. Nurse Lowes stated, "The Provider has ordered labs to check your liver. I just have to get permission from SHP to do it." *Id.*

On June 3, 2019, Nurse Lowe was informed by Darrell Regan, SHP Regional Director, that he would let Nurse Lowe know whether to proceed with obtaining the additional laboratory testing. *Id.,* ¶ 50.

On June 5, 2019, PA Dillion issued medical orders to refer Plaintiff to a gastroenterology specialist to assess Plaintiff's Hepatitis C. *Id.*, ¶ 51. PA Dillion also issued orders to discontinue further laboratory testing until Plaintiff had been seen by the specialist. *Id.*

On June 10, 2019, Nurse Lowe encountered Plaintiff while she was providing medical care to other inmates in the pod. *Id.*, ¶ 52. Plaintiff inquired about obtaining Hepatitis C treatment. *Id.* Nurse Lowe noted that Plaintiff was alert and oriented, his skin was normal in color, and the sclerae of his eyes were white, with no yellowing. *Id.*

On June 12, 2019, Plaintiff submitted a sick call slip stating, "I received a grievance return and was told that blood labs were ordered by the 'Ghost Doctor' but approval was needed from SHIP (Southern Health Partners). As of today I have yet to receive my labs and/or any treatment for Hepatitis C and would like to know if approval has came and/or is coming from SHP for treatment?" *Id.*, ¶ 53.

On June 13, 2019, pursuant to medical orders from PA Dillon, Nurse Lowe contacted Cookeville Regional Medical Group and made an appointment for Plaintiff to be seen in consultation by a gastroenterology specialist. *Id.*, ¶ 54.

Also on June 13, 2019, Nurse Lowe received Plaintiff's June 12, 2019 sick call request. *Id.*, ¶ 55. Nurse Lowe noted that Plaintiff had been referred to a specialist for further evaluation. *Id.* Nurse Lowe added, "My provider & SHP have referred your case to a specialist. You have an appointment scheduled." *Id.*

On August 1, 2019, Plaintiff was transported to Cookeville Regional Medical Group, where he was seen by Jessica Randolph, NP. *Id.*, ¶ 56. Nurse Randolph noted that Plaintiff was healthy-appearing, well-nourished, well-developed, and in no apparent distress. *Id.* His mental status was normal, his abdomen was non-tender with no guarding, masses, or rebound tenderness. *Id.* His liver was non-tender with no enlargement. *Id.* She recommended further laboratory testing, and that if Plaintiff's drug screen was negative, treatment for Hepatitis C would be started. *Id.*

Also on August 1, 2019, upon Plaintiff's return to the Jail, I contacted PA Dillon to obtain authorization for the additional laboratory testing. *Id.*, ¶ 57.

On August 8, 2019, PA Dillon issued medical orders for Hepatitis C viral load testing, to assess whether Plaintiff's disease had cleared naturally. *Id.*, ¶ 58. Nurse Lowe drew blood samples from Plaintiff on August 12, 2019 and submitted them to Quest Diagnostics for analysis on August 13, 2019. *Id.*, ¶ 59. On August 15, 2019, Quest Diagnostics reported that the result of the Hepatitis C RNA Quantitative Real Time PCR test was 5480000 IU/mL. *Id.*

On September 10, 2019, Plaintiff submitted a sick call slip, stating "My left wrist and arm is hurting. Rash on chest (ringworm) and I've been using hydrocortisone but won't go away, urine strong smelling with dark color." *Id.*, ¶ 60.

Nurse Lowe received Plaintiff's sick call slip on September 11, 2019. *Id.*, ¶ 61. Nurse Lowe saw Plaintiff on September 12, 2019 in the Jail medical office for complaints of left wrist pain and a rash on his chest. *Id.*, ¶ 62. Nurse Lowe noted that Plaintiff's blood pressure was 110/72, pulse was 86, respirations were 19, oxygen saturation was 97%, weight was 162.8, and temperature was 98.3. *Id.* Plaintiff's skin was dry and warm, he was alert, oriented, and cooperative, and his respirations were even and unlabored. *Id.* Nurse Lowe noted that there was no redness or edema to his wrist, and he had good range of motion. *Id.* Nurse Lowe observed a small round spot on his mid-chest that appeared to be ringworm. *Id*. Pursuant to medical orders, Nurse Lowe provided Plaintiff with ibuprofen 400 mg twice per day for three days, and tolnaftate (antifungal) cream, to be applied twice per day for seven days. *Id*. Nurse Lowe noted that Plaintiff should follow up with the Medical Director if there was no improvement. *Id.*

On October 25, 2019, Plaintiff submitted a Grievance Form stating, "Nurse Marissa I am not receiving adequate medical care in that no treatment for my Hepatitis C has been forthcoming since the initial doctors visit I had which was supposed to initiate treatment after the strain of Hepatitis C which was ascertained yet treatment has stopped and such cure for this disease is being withheld which does endanger my life by allowing the stages of Hepatitis C to progress wherein life expectancy will be reduced and/or imminent death will result due to the lack of adequate medical care." *Id.*, ¶ 63.

On October 28, 2019, Nurse Lowe responded in writing to Plaintiff's October 25, 2019 grievance, stating, "I have emailed my supervisor for instructions." *Id.*, ¶ 64. Also on October 28, 2019, Nurse Lowe noted that Plaintiff had not submitted any sick calls or reported any problems with nausea, vomiting, abdominal pain, yellowing of skin or sclerae, fatigue, loss of appetite, abdominal bloating or weight loss. *Id.*, ¶ 65.

Plaintiff signed his Complaint in this action on October 31, 2019. *Id.*, ¶ 66.

On November 6, 2019, PA Dillon saw Plaintiff in the Jail medical office. *Id.*, ¶ 67. Plaintiff informed PA Dillion that he had probably contracted Hepatitis C from intravenous drug use or from tattoos. *Id.* Plaintiff was aggressive and demanding. *Id.* PA Dillon observed that Plaintiff's sclerae were not yellowed, his abdomen was supple and nontender with no ascites. *Id.* His lungs were clear, heart rate and rhythm were regular, and his skin was not jaundiced. *Id.* PA Dillon issued medical orders for laboratory tests to determine whether Plaintiff had developed liver fibrosis, and to determine Plaintiff's Hepatitis C drug resistance. *Id.*

On November 13, 2019, pursuant to medical orders from PA Dillon, Nurse Lowe collected Plaintiff's blood for testing and submitted it to Quest Diagnostics for analysis. *Id.*, ¶ 68.

On November 18, 2019, Quest Diagnostics reported that Plaintiff's AST was 52 and his ALT was 92. *Id.*, ¶ 69. His Hepatitis C RNA Quantitative Real time PCR result was 406000. *Id.* His Hepatitis C antibody test was reactive, at 26.80. *Id.* Also on November 18, 2019, pursuant to medical orders, Nurse Lowe collected a blood sample from Plaintiff and on November 19, 2019, submitted it to Quest Diagnostics for analysis via a "fibrotest," to determine whether Plaintiff had developed liver fibrosis. *Id.*, ¶ 70.

On November 29, 2019, Quest Diagnostics reported that Plaintiff's fibrotest showed that Plaintiff had no liver fibrosis. *Id.*, ¶ 71.

On December 6, 2019, Nurse Lowe faxed a signed release and a request to the Fentress County Health Department for Plaintiff's treatment records. *Id.*, ¶ 72. On December 9, 2019, Nurse Lowe received Plaintiff's treatment records from the Fentress County Health Department. *Id.*, ¶ 73. The records showed that Plaintiff had been diagnosed with chronic Hepatitis C on May 8, 2018. *Id.* On July 10, 2018, Plaintiff had declined the Health Department's offer of referral to a

gastrointestinal specialist for Hepatitis C treatment. *Id*.

On December 9, 2019, PA Dillon issued medical orders for an abdominal ultrasound of Plaintiff's liver. *Id.*, ¶ 74. On December 16, 2019, an ultrasound test was performed of Plaintiff's abdomen. *Id.*, ¶ 75. Dr. Pratul M. Patel reported that "Real time examination shows the liver to be homogenous in texture and unremarkable in size," and "portal vein patent and measure 11.9 mm with hepatoperal flow and velocity of 33.0 cm/sec. No ascites." *Id*. Dr. Patel concluded that Plaintiff had an "unremarkable abdominal ultrasound." *Id*.

On January 9, 2020, Nurse Lowe was conducting blood sugar checks and observed Plaintiff in his cell. *Id.*, ¶ 76. Nurse Lowe noted that Plaintiff was alert and oriented, and in no apparent distress. *Id*. His skin color was normal, and he voiced no complaints. *Id*.

On February 25, 2020, Nurse Lowe observed Plaintiff walking around in his cell. *Id.*, ¶ 77. Nurse Lowe noted that Plaintiff was alert and oriented, in no apparent distress, and expressed no complaints. *Id*. Plaintiff's skin color was normal. *Id*.

On March 19, 2020, Nurse Lowe observed Plaintiff walking around in his cell. *Id*. Nurse Lowe noted that he was alert and oriented, in no apparent distress, and expressed no complaints. *Id.*, ¶ 78. His skin color was normal. *Id*.

During his incarceration at the Jail, Plaintiff has not complained or shown any symptoms of Hepatitis C-related liver disease such as jaundice, fatigue, nausea, fever, abdominal pain, fluid in the abdomen, loss of appetite or muscle aches. *Id.*, ¶ 79.

During his incarceration at the Jail, Plaintiff has received medical attention in response to every sick call slip he has submitted, and he has been provided a response to every medical complaint that he has made. *Id*., ¶ 80.

Based on her education, training, and experience, as well as her review of Plaintiff's

medical chart, it is Nurse Lowe's opinion that Plaintiff has received extensive, prompt, and appropriate medical treatment for all of his medical complaints and conditions. *Id.* All of his medical attention has been within the standard of care. *Id.* Moreover, it is further Nurse Lowe's opinion that no act or failure to act by any member of the medical staff has proximately caused any injury to Plaintiff. *Id.* On no occasion has Plaintiff ever been at risk of serious harm, nor has any member of the SHP medical staff ever been indifferent to any complaint that he has made. *Id.*

### B.      Declaration of Casey Dillion, PA

Casey Dillon, PA, obtained a Bachelor of Science degree from Tennessee Tech University in 2012 and obtained a Master of Science degree in Physician Assistant Studies from the University of Kentucky in 2016. Docket No. 38-3, ¶ 2. Casey Dillon has been licensed as a PA since 2016 and has served as the Medical Director at the Fentress County Jail since December 7, 2018. *Id.*

Health care in the Jail is provided under the direction of the MTA, as well as a Medical Director. *Id.*, ¶ 3. From September 25, 2017 to the time of this Declaration, Nurse Lowe has been the MTA. *Id.*

When an inmate requires routine medical care, he or she obtains an inmate "sick call slip" from the corrections officer on duty in the housing unit and that slip is provided to the medical staff for action. *Id.*, ¶ 4. Routine sick calls are conducted by medical staff inside the housing unit. *Id.*

Plaintiff was booked into the Jail on the night of September 4, 2018, for charges of aggravated assault, attempted homicide, attempted vandalism, and assault. *Id.*, ¶ 5. When Plaintiff was booked into the Jail on September 4, 2018, the Medical Director was Trent Dority, NP. *Id.*, ¶ 6. Lanita Gann, FNP, was the Medical Director from October 31, 2018 to December 7, 2018. *Id.* From December 7, 2018 to the present, Casey Dillon, PA, has been the Medical Director. *Id.*

21

On January 2, 2019, Nurse Lowe was notified that Plaintiff was to undergo a court-ordered forensic evaluation through the Moccasin Bend Mental Health Institute. *Id.*, ¶ 7.

On January 31, 2019, Plaintiff was admitted to Moccasin Bend for a forensic evaluation. *Id.*, ¶ 8.

On February 21, 2019, Rachel Appleby, NP, the mental health examiner at Moccasin Bend, noted that Plaintiff had presented with paranoid delusions, auditory hallucinations, physical aggression, and polysubstance abuse. *Id.*, ¶ 9. She reported no physical aggression and no symptoms of psychosis. *Id.* She diagnosed Plaintiff with Amphetamine-induced psychotic disorder, opioid use disorder, methamphetamine use disorder, antisocial personality disorder, other hallucinogen use disorder, tobacco use disorder, Hepatitis C, and cannabis use disorder. *Id.* In her opinion, Plaintiff was competent to stand trial, and there was no support for an insanity defense. *Id.*

Blood tests conducted at Moccasin Bend indicated AST (SGOT) of 52, and ALT (SGPT) or 109. *Id.*, ¶ 10. On February 22, 2019, Plaintiff was discharged from Moccasin Bend and returned to the Jail. *Id.*, ¶ 11.

On May 5, 2019, Plaintiff submitted a sick call slip, stating, "Can I see the doctor about my hepatitis? When should I have my levels checked again? Can I get the HARVONI while I'm here?" *Id.*, ¶ 12. On May 6, 2019, Nurse Lowe responded to Plaintiff's sick call request by noting that Plaintiff would be seen by the Medical Director at his next jail visit. *Id.*, ¶ 13.

On May 23, 2019, PA Dillon saw Plaintiff in the Jail medical office. *Id.*, ¶ 14. Plaintiff demanded treatment for Hepatitis C. *Id.* Plaintiff stated, "I know this guy named 'Darr' is getting treatment and you prescribed it." *Id.* PA Dillon informed Plaintiff that it would be a HIPPA violation to disclose any medical information about another patient. *Id.* Plaintiff became very rude

and obnoxious, and again requested that PA Dillon treat him for Hepatitis C. *Id.* PA Dillon noted that Plaintiff had a history of intravenous drug use. *Id.* Also on May 23, 2019, PA Dillon noted that Plaintiff was alert and oriented, his head, ears, eyes, and nose were clear, with no yellowing of the sclerae or skin. *Id.*, ¶ 15. PA Dillon noted that there was no laboratory confirmation in Plaintiff's medical chart that he had ever been diagnosed with Hepatitis C. *Id.* He informed Plaintiff that Hepatitis C treatment would require consultation with a specialist and approval from Defendant and Fentress County. *Id.* He cautioned Plaintiff that there was no guarantee that the requested treatment would be provided. *Id.* Plaintiff then demanded that PA Dillon prescribe him the medication Motrin. *Id.* PA Dillon informed Plaintiff that it was not advisable for him to take Motrin because this medication carries a risk of accelerating liver cirrhosis in higher doses. *Id.*

On May 23, 2019, Plaintiff stormed out of the door of the medical office and stated that he would file a lawsuit against the nurse practitioner and the nurse. *Id.*, ¶ 16.

On May 24, 2019, Nurse Lowe encountered Plaintiff at the doorway of his pod during medication pass. *Id.*, ¶ 17. Plaintiff was handing some paperwork to a corrections officer. *Id.* The document stated, "I have been refused medical treatment." *Id.* Nurse Lowe verbally informed Plaintiff that he had not been denied medical treatment, and that discussions were underway about whether to initiate medical treatment for his Hepatitis C. *Id.* Nurse Lowe also informed Plaintiff that he would be given no medications such as ibuprofen that were metabolized by the liver because of his suspected Hepatitis C. *Id.* Also, on May 24, 2019, Nurse Lowe observed that Plaintiff was alert and oriented, his skin color was normal, the sclerae of both eyes were white, with no yellowing, and he appeared in no distress. *Id.*, ¶ 18.

Additionally, on May 24, 2019, Plaintiff submitted an "Inmate Request," stating "Nurse Marissa, I have talked to Darr, and have found out that I as wrong in my understanding that he

received the Harvoni. Apparently the "Ghost Doctor" told him that it was the generic Harvoni which is what led to the problem. I apologize for any undue crap I may have caused you for my mistake but I would still like to grieve the issue as I do believe there ought to be some relief to be had as it is a cure and I do have the disease that is continuing to get worse and to wait until I contract cirrhosis of the liver before I receive the needed medication seems a bit ridiculous to me as it would then be to [*sic*] late as the final stages would have begun. What about interferon? That is the old kind of treatment. Is that possible to get? If I need to rewrite my grievance for my mistake I will or you can attach this to it as I will still be pursuing legal possibility of obtaining the cure as the law and many constitutional articles and amendments do give me the right to life if there is a cure to a disease I have and I will seek this as my right is. Once again forgive me for my Mistake as lies have caused yet another unnecessary problem." *Id.*, ¶ 19.

On May 30, 2019, PA Dillion issued medical orders for additional laboratory testing for Plaintiff to determine whether Plaintiff had cirrhosis. *Id.*, ¶ 20.

On June 5, 2019, PA Dillion issued medical orders to refer Plaintiff to a gastroenterology specialist to assess Plaintiff's Hepatitis C. *Id.*, ¶ 21. PA Dillion also issued orders to discontinue further laboratory testing until Plaintiff had been seen by the specialist. *Id.*

On June 10, 2019, Nurse Lowe encountered Plaintiff while she was providing medical care to other inmates in the pod. *Id.*, ¶ 22. Plaintiff inquired about obtaining Hepatitis C treatment. *Id.* Nurse Lowe noted that Plaintiff was alert and oriented, his skin was normal in color, and the sclerae of his eyes were white, with no yellowing. *Id.*

On June 12, 2019, Plaintiff submitted a sick call slip stating, "I received a grievance return and was told that blood labs were ordered by the 'Ghost Doctor' but approval was needed from SHIP (Southern Health Partners). As of today, I have yet to receive my labs and/or any treatment

for Hepatitis C and would like to know if approval has came and/or is coming from SHP for treatment?" *Id.*, ¶ 23.

On June 13, 2019, pursuant to medical orders from PA Dillon, Nurse Lowe contacted Cookeville Regional Medical Group and made an appointment for Plaintiff to be seen in consultation by a gastroenterology specialist. *Id.*, ¶ 24.

Also, on June 13, 2019, Nurse Lowe received Plaintiff's June 12, 2019 sick call request. *Id.*, ¶ 25. Nurse Lowe noted that Plaintiff had been referred to a specialist for further evaluation. *Id.* Nurse Lowe added, "My provider & SHP have referred your case to a specialist. You have an appointment scheduled." *Id.*

On August 1, 2019, Plaintiff was transported to Cookeville Regional Medical Group, where he was seen by Jessica Randolph, NP. *Id.*, ¶ 26. Nurse Randolph noted that Plaintiff was healthy-appearing, well-nourished, well-developed, and in no apparent distress. *Id.* His mental status was normal, his abdomen was non-tender with no guarding, masses, or rebound tenderness. *Id.* His liver was non-tender with no enlargement. *Id.* She recommended further laboratory testing, and that if Plaintiff's drug screen was negative, treatment for Hepatitis C would be started. *Id.*

Also, on August 1, 2019, upon Plaintiff's return to the Jail, I contacted PA Dillon to obtain authorization for the additional laboratory testing. *Id.*, ¶ 27.

On August 8, 2019, PA Dillon issued medical orders for Hepatitis C viral load testing, to assess whether Plaintiff's disease had cleared naturally. *Id.*, ¶ 28. Nurse Lowe drew blood samples from Plaintiff on August 12, 2019 and submitted them to Quest Diagnostics for analysis on August 13, 2019. *Id.*, ¶ 29. On August 15, 2019, Quest Diagnostics reported that the result of the Hepatitis C RNA Quantitative Real Time PCR test was 5480000 IU/mL. *Id.*

On September 10, 2019, Plaintiff submitted a sick call slip, stating "My left wrist and arm

is hurting. Rash on chest (ringworm) and I've been using hydrocortisone but won't go away, urine strong smelling with dark color." *Id.*, ¶ 30.

Nurse Lowe received Plaintiff's sick call slip on September 11, 2019. *Id.*, ¶ 31. Nurse Lowe saw Plaintiff on September 12, 2019 in the Jail medical office for complaints of left wrist pain and a rash on his chest. *Id.*, ¶ 32. Nurse Lowe noted that Plaintiff's blood pressure was 110/72, pulse was 86, respirations were 19, oxygen saturation was 97%, weight was 162.8, and temperature was 98.3. *Id.* Plaintiff's skin was dry and warm, he was alert, oriented, and cooperative, and his respirations were even and unlabored. *Id.* Nurse Lowe noted that there was no redness or edema to his wrist, and he had good range of motion. *Id.* Nurse Lowe observed a small round spot on his mid-chest that appeared to be ringworm. *Id.* Pursuant to medical orders, Nurse Lowe provided Plaintiff with ibuprofen 400 mg twice per day for three days, and tolnaftate (antifungal) cream, to be applied twice per day for seven days. *Id.* Nurse Lowe noted that Plaintiff should follow up with the Medical Director if there was no improvement. *Id.*

On October 28, 2019, Nurse Lowe noted that Plaintiff had not submitted any sick calls or reported any problems with nausea, vomiting, abdominal pain, yellowing of skin or sclerae, fatigue, loss of appetite, abdominal bloating or weight loss. *Id.*, ¶ 33.

Plaintiff signed his Complaint in this action on October 31, 2019. Id., ¶ 34.

On November 6, 2019, PA Dillon saw Plaintiff in the Jail medical office. *Id.*, ¶ 35. Plaintiff informed PA Dillion that he had probably contracted Hepatitis C from intravenous drug use or from tattoos. *Id.* Plaintiff was aggressive and demanding. *Id.* PA Dillon observed that Plaintiff's sclerae were not yellowed, his abdomen was supple and nontender with no ascites. *Id.* His lungs were clear, heart rate and rhythm were regular, and his skin was not jaundiced. *Id.* PA Dillon issued medical orders for laboratory tests to determine whether Plaintiff had developed liver fibrosis, and

to determine Plaintiff's Hepatitis C drug resistance. *Id.*

On November 13, 2019, pursuant to medical orders from PA Dillon, Nurse Lowe collected Plaintiff's blood for testing and submitted it to Quest Diagnostics for analysis. *Id.*, ¶ 36.

On November 18, 2019, Quest Diagnostics reported that Plaintiff's AST was 52 and his ALT was 92. *Id.*, ¶ 37. His Hepatitis C RNA Quantitative Real time PCR result was 406000. *Id.* His Hepatitis C antibody test was reactive, at 26.80. *Id.* Also on November 18, 2019, pursuant to PA Dillon's medical orders, Nurse Lowe collected a blood sample from Plaintiff and on November 19, 2019, submitted it to Quest Diagnostics for analysis via a "fibrotest," to determine whether Plaintiff had developed liver fibrosis. *Id.*, ¶ 38.

On November 29, 2019, Quest Diagnostics reported that Plaintiff's fibrotest showed that Plaintiff had no liver fibrosis. *Id.*, ¶ 39.

On December 6, 2019, Nurse Lowe faxed a signed release and a request to the Fentress County Health Department for Plaintiff's treatment records. *Id.*, ¶ 40. On December 9, 2019, Nurse Lowe received Plaintiff's treatment records from the Fentress County Health Department. *Id.*, ¶ 41. The records showed that Plaintiff had been diagnosed with chronic Hepatitis C on May 8, 2018. *Id.* On July 10, 2018, Plaintiff had declined the Health Department's offer of referral to a gastrointestinal specialist for Hepatitis C treatment. *Id.*

On December 9, 2019, PA Dillon issued medical orders for an abdominal ultrasound of Plaintiff's liver. *Id.*, ¶ 42. On December 16, 2019, an ultrasound test was performed of Plaintiff's abdomen. *Id.*, ¶ 43. Dr. Pratul M. Patel reported that "Real time examination shows the liver to be homogenous in texture and unremarkable in size," and "portal vein patent and measure 11.9 mm with hepatoperal flow and velocity of 33.0 cm/sec. No ascites." *Id.* Dr. Patel concluded that Plaintiff had an "unremarkable abdominal ultrasound." *Id.*

On January 9, 2020, Nurse Lowe was conducting blood sugar checks and observed Plaintiff in his cell. *Id.*, ¶ 76. Nurse Lowe noted that Plaintiff was alert and oriented, and in no apparent distress. *Id.* His skin color was normal, and he voiced no complaints. *Id.*

On February 25, 2020, Nurse Lowe observed Plaintiff walking around in his cell. *Id.*, ¶ 45. Nurse Lowe noted that Plaintiff was alert and oriented, in no apparent distress, and expressed no complaints. *Id.* Plaintiff's skin color was normal. *Id.*

On March 19, 2020, Nurse Lowe observed Plaintiff walking around in his cell. *Id.* Nurse Lowe noted that he was alert and oriented, in no apparent distress, and expressed no complaints. *Id.*, ¶ 46. His skin color was normal. *Id.*

During his incarceration at the Jail, Plaintiff has not complained or shown any symptoms of Hepatitis C-related liver disease such as jaundice, fatigue, nausea, fever, abdominal pain, fluid in the abdomen, loss of appetite or muscle aches. *Id.*, ¶ 47.

Plaintiff's medical imaging and blood testing confirmed the presence of Hepatitis C; however, the testing shows that his liver enzymes are not at critical levels, his liver is of normal size and texture, and he has no signs of liver fibrosis. *Id.*, ¶ 48.

During his incarceration at the Jail, Plaintiff has received medical attention in response to every sick call slip he has submitted, and he has been provided a response to every medical complaint that he has made. *Id.*, ¶ 49.

Hepatitis C is a liver infection caused by the Hepatitis C virus. *Id.*, ¶ 50. It is one of numerous conditions that can cause liver damage and cirrhosis. *Id.* Chronic liver disease in patients with Hepatitis C develops slowly, usually without any symptoms over several decades. *Id.* Disease progression of Hepatitis C is measured by the degree of liver fibrosis, with most complications occurring in patients with advanced fibrosis. *Id.* Some patients experience spontaneous resolution

28

of chronic Hepatitis C, and some patients progress to the point where liver function is compromised and develop end-stage liver disease (ESLD). *Id.* The progression of liver fibrosis to ESLD occurs over decades and does not occur in every individual with Hepatitis C. *Id.*

Hepatitis C is currently treated through a medication regimen with drugs called DAAs (direct-acting antiviral medications). *Id.*, ¶ 51. In order to be a candidate for DAA treatment, it is important that the patient be able to complete the treatment regimen. *Id.* A typical medication regimen takes from eight (8) to twelve (12) weeks, plus follow-up treatment. *Id.*

If an inmate is not actively receiving Hepatitis C treatment upon entry to the Jail and they have not yet been sentenced, it is not medically advisable to initiate Hepatitis C treatment during their Jail term. *Id.*, ¶ 52. This is because an unsentenced inmate may not remain in Jail for a sufficient period of time to successfully completed a treatment regimen and to receive the necessary follow-up care and monitoring. *Id.* The treatment may be interrupted or discontinued upon the inmate's release from Jail or their transfer to a different facility, which may result in serious adverse medical consequences for the patient, including development of resistance to future treatment with Hepatitis C medications. *Id.*

As the Medical Director for the Jail, PA Dillion has established protocols for the Jail medical staff to follow when providing medical treatment to patients at this facility. *Id.*, ¶ 53.  For patients presenting to the Jail with a history of Hepatitis C, the treatment protocol is as follows:

> a)      The nursing staff verifies the diagnosis through the patient's practitioner and obtains medical records including current treatment of disease.
> b)      Any signs and/or symptoms of acute disease or liver failure require evaluation and treatment with referral to a local infectious disease clinic and/or GI physician.
>
> c)      If patients are actively receiving verified treatment, then such treatment is to continue during length of incarcerated stay. The nursing staff will set up the patient for liver profile testing. After the lab results are reviewed by me, then I will determine whether a viral load or further testing is needed.

d)      The patient must be able to complete treatment for this to be effective in disease care management. More harm than good is done when treatment is started and then stopped. Therefore, if the patient has not been receiving treatment prior to incarceration and will not be incarcerated for a consistent and long time period, the patient's availability to complete treatment upon discharge from Jail should be considered.

*Id.*

In addition to PA Dillion's position as Medical Director for the Jail, PA Dillon also provides medical services to inmates at Bledsoe County Correctional Complex, a corrections facility of the Tennessee Department of Correction (TDOC). *Id.*, ¶ 54. At this facility, PA Dillion provides treatment to TDOC inmates who have been diagnosed with Hepatitis C, following clinical guidelines developed and established by TDOC. *Id.*

The TDOC Hepatitis C guidance does not generally recommend Hepatitis screening for asymptomatic, highly mobile, non-sentenced inmates. *Id.*, ¶ 55.

The treatment protocols for Hepatitis C at the Jail and PA Dillon's treatment of Plaintiff are medically reasonable and appropriate and are consistent with the TDOC's clinical guidance for the evaluation and management of Hepatitis C infection. *Id.*, ¶ 56.

Because Plaintiff has not been sentenced, it is unknown whether he will be in the jail for a sufficient period of time to successfully complete a treatment regimen and to receive the necessary follow-up care and monitoring. *Id.,* ¶ 57. Plaintiff could be released from jail or transferred to a different facility, which could result in serious adverse medical consequences for him, including the development of resistance to future treatment with Hepatitis C medications. *Id.* For this reason, initiating Hepatitis treatment for Plaintiff at the current time is not medically recommended. *Id.*

Plaintiff's medical imaging and blood testing confirm the presence of Hepatitis C; however, the testing shows that his condition has been relatively stable and does not appear to have significantly progressed for the last two years. *Id.*, ¶ 58. His liver enzymes are not at critical levels,

his bilirubin levels are in normal range, his liver is of normal size and texture with no signs of fibrosis or liver failure, and he has been asymptomatic for Hepatitis C. *Id.*

Give the stability of his current medical condition, it is PA Dillon's opinion that continuing to monitor Plaintiff for disease progression is the most medically appropriate course of action that will not place him at a risk of immediate or irreparable harm. *Id.*, ¶ 59. If his condition worsens while he is still in the jail, then it will be necessary to re-evaluate whether to initiate treatment at that time. *Id.*

Based on PA Dillon's education, training, and experience, as well as review of Plaintiff's medical chart, it is PA Dillon's opinion that Plaintiff has received prompt and appropriate medical treatment for all of his medical complaints and conditions. *Id.*, ¶ 60. All of his medical attention has been within the standard of care. *Id.* Moreover, it is further PA Dillon's opinion that no act or failure to act by any member of the SHP medical staff has proximately caused any injury to Plaintiff. *Id.* On no occasion has Plaintiff ever been at risk of serious harm, nor has any member of the SHP medical staff ever been indifferent to any complaint that he has made. *Id.*

**C.    Declaration of Kenneth Mathews, MD**

Kenneth Mathews, MD, obtained his medical degree from Loma Linda University in Loma Linda, California, in September 1975, and a Master of Science in Public Health from the University of Utah in 1979. Docket No. 38-4, ¶ 2. Dr. Mathews is licensed to practice medicine in North Carolina and Georgia, and he has been licensed to practice medicine in the State of Tennessee since 1980. *Id.* Dr. Mathews is Board Certified in Preventative Medicine and Occupational Medicine. *Id.* Dr. Mathews has been providing correctional medical services since 1977 and has served as the Medical Director for numerous county jail facilities in Tennessee. *Id.*

During his years of practicing correctional medicine, Dr. Mathews has provided medical

treatment and consultation to many inmates who have had Hepatitis C. *Id.*, ¶ 3.

Hepatitis C is a liver infection caused by the Hepatitis C virus. *Id.*, ¶ 4. It is one of numerous conditions that can cause liver damage and cirrhosis. *Id.* Chronic liver disease in patients with Hepatitis C develops slowly, usually without any symptoms over several decades. *Id.* Disease progression of Hepatitis C is measured by the degree of liver fibrosis, with most complications occurring in patients with advanced fibrosis. *Id.* Some patients experience spontaneous resolution of chronic Hepatitis C, and some patients progress to the point where liver function is compromised and develop end-stage liver disease (ESLD). *Id.* The progression of liver fibrosis to ESLD occurs over decades and does not occur in every individual with Hepatitis C. *Id.*

Hepatitis C is generally treated through a medication regimen with certain medicines or combinations of medicines. *Id.*, ¶ 5. In order to be a candidate for treatment, it is important that the patient be able to complete the treatment regimen. *Id.* A typical medication regimen takes from eight (8) to twelve (12) weeks, plus follow-up treatment. *Id.*

If an inmate is not actively receiving Hepatitis C treatment upon entry to the Jail and they have not yet been sentenced, it is Dr. Mathews' professional medical opinion that it is not medically advisable to initiate Hepatitis C treatment during their Jail term. *Id.*, ¶ 6. This is because an unsentenced inmate may not remain in Jail for a sufficient period of time to successfully completed a treatment regimen and to receive the necessary follow-up care and monitoring. *Id.* The treatment may be interrupted or discontinued upon the inmate's release from Jail or their transfer to a different facility, which may result in serious adverse medical consequences for the patient, including development of resistance to future treatment with Hepatitis C medications. *Id.*

The TDOC Hepatitis C guidance does not generally recommend Hepatitis screening for asymptomatic, highly mobile, non-sentenced inmates. *Id.*, ¶ 7.

The treatment protocols for Hepatitis C at the Jail and PA Dillon's treatment of Plaintiff are medically reasonable and appropriate and are consistent with the TDOC' clinical guidance for the evaluation and management of Hepatitis C infection. *Id.*, ¶ 56.

Because Plaintiff has not been sentenced, it is unknown whether he will be in the Jail for a sufficient period of time to successfully complete a treatment regimen and to receive the necessary follow-up care and monitoring. *Id.*, ¶ 8. For this reason, it is Dr. Mathews' professional medical opinion that initiating Hepatitis treatment for Plaintiff at the current time is not medically recommended. *Id.*

Dr. Mathews has reviewed Plaintiff's medical chart, including those documents relating to Hepatitis C testing. *Id.*, ¶ 9. Plaintiff's medical imaging and blood testing confirm the presence of Hepatitis C; however, the testing shows that his condition has been relatively stable and does not appear to have significantly progressed for the last two years. *Id.* His liver enzymes are not at critical levels, his liver shows no signs of fibrosis, and he has been asymptomatic for Hepatitis C. *Id.* Given his current medical condition, it is Dr. Mathews' professional medical opinion that delaying Hepatitis C treatment will not place Plaintiff at risk of immediate or irreparable harm. *Id.*

Dr. Mathews is familiar with the Physician Provider Treatment Protocols that have been established for the Jail, and it is his opinion that these protocols are medically reasonable and appropriate for the treatment of Hepatitis patients in this Jail. *Id.*, ¶ 10.

Based on Dr. Mathew's education, training, and experience, as well as review of Plaintiff's medical chart, it is Dr. Mathew's professional medical opinion that Plaintiff has received extensive, prompt, and appropriate medical treatment for all of his medical complaints and conditions. *Id.*, ¶ 11. All of his medical attention has been within the standard of care. *Id.* Moreover, it is further Dr. Mathew's opinion that no act or failure to act by any member of the medical staff

has proximately caused any injury to Plaintiff. *Id.* On no occasion was Plaintiff ever at risk of serious harm, nor was any member of the SHP medical staff ever indifferent to any complaint that he has made. *Id.*

### D.    Declaration of Candy Price

Candy Price is the Jail Administrator for the Jail; as such she handles the day to day operations of the Jail. Docket No. 38-5, ¶ 2.

Plaintiff was booked into the Jail on September 4, 2018. *Id.*, ¶ 3. All inmates in the Jail are provided with the Inmate Handbook, which includes the Inmate Grievance Procedures. *Id.*, ¶ 4. Each inmate signs an acknowledgment that they have received these materials. *Id.*

According to the Inmate Grievance Procedures, inmates in the Jail are encouraged to resolve grievances informally. *Id.*, ¶ 5. If an inmate is not satisfied with the informal resolution, the inmate may submit a grievance on an Inmate Grievance Form to a corrections officer. *Id.*

The grievance is forwarded to the responsible supervisor, who reviews the form and indicates the action taken in response to the grievance. *Id.,* ¶ 6. The Jail Administrator reviews the completed grievance and forwards a copy of the completed grievance to the inmate. *Id.*

If any inmate wishes to appeal a response to a grievance, the inmate must submit a Grievance Appeal Form to the Sheriff within five calendar days of the date actions were taken on the initial grievance. *Id.*, ¶ 7.

Upon receipt of an appeal, the Sheriff will respond to the inmate with an explanation of findings and an indication that the appeal has been approved or denied. *Id.*, ¶ 8. The decision reached and actions taken by the Sheriff are the final authority in the grievance mechanism. *Id.*

Jail Administrator Price has submitted a true and correct copy of the Inmate Grievance Procedure of the Fentress County Sheriff's Department, the acknowledgment that Plaintiff signed

upon being booked into the Jail, and copies of all grievances filed by Plaintiff. *Id.*, ¶¶ 9-11; Exs.

A-C. There is no record of Plaintiff submitting any appeals of any grievances to the Sheriff while

in the Jail. *Id.*, ¶ 12.

### III. Law and Analysis

#### A.  Local Rules 7.01(a)(3) and 56.01(a), (b), (c), and (f)

Local Rule 7.01(a)(3) states:

**3.  Response.**  Except for motions for reconsideration (to which no response shall be filed unless ordered by the Court), any party opposing a motion must serve and file a memorandum of law in response, and, if necessary to support assertions of fact, affidavits and depositions, not later than fourteen (14) days after service of the motion, except, that in cases of a motion for summary judgment, that time shall be twenty-one (21) days after the service of the motion, unless otherwise ordered by the Court. The response shall not exceed twenty-five (25) pages without leave of Court. If a timely response is not filed, the motion shall be deemed to be unopposed, except for motions to reconsider for which no response shall be permitted unless ordered by the Court.

Defendant filed its Motion on June 8, 2020. Docket No. 36. Plaintiff has failed to

respond.

Additionally, with respect to Motions for Summary Judgment specifically, Local Rules

56.01(a), (b), (c), and (f) state, in pertinent part:

**a.  Time for Response.** Motions for summary judgment pursuant to Fed. R. Civ. P. 56 must be in accordance with that Rule except that the party opposing the motion shall have twenty-one (21) days after service of the motion in which to serve a response, unless otherwise ordered by the Court.

**b.  Statement of Undisputed Material Facts.** In order to assist the Court in ascertaining whether there are any material facts in dispute, any motion for summary judgment made pursuant to Fed. R. Civ. P. 56 must be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial. Each fact must be set forth in a separate, numbered paragraph. Each fact must be supported by a specific citation to the record. . . .

**c. Response to Statement of Facts.** Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either: (1) agreeing

that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed. Each disputed fact must be supported by a citation to the record. ... In addition, the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried. Each such disputed fact must be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute.

. . .

**f. Failure to Respond.** If a timely response to a moving party's statement of material facts, or a non-moving party's statement of additional facts, is not filed within the time periods provided by these rules, the asserted facts shall be deemed undisputed for purposes of summary judgment.

As noted, Defendant filed the instant Motion on June 8, 2020, and Plaintiff has failed to respond. Additionally, Plaintiff has failed to respond to Defendant's Concise Statement of Undisputed Facts. Plaintiff's failure to respond indicates "that the asserted facts are not disputed for the purposes of summary judgment." Accordingly, there are no genuine issues as to any material fact and all that remains to be determined is whether Defendant is entitled to a judgment as a matter of law.

### B. Motion for Summary Judgment

It would be inappropriate to grant Defendant's Motion solely on the ground that Plaintiff has failed to properly respond. *See Stough v. Mayville Community Schools*, 138 F.3d 612, 614 (6th Cir. 1998). As the Sixth Circuit has stated:

[A] district court cannot grant summary judgment in favor of the movant simply because the adverse party has not responded. The Court is required, at a minimum, to examine the movant's Motion for Summary Judgment to ensure that he has discharged [his initial] burden ... The federal rules require that the party filing a Motion for Summary Judgment "always bears the burden of demonstrating the absence of a genuine issue as to a material fact."

*Id.* (citations omitted). The Court will, therefore, consider whether Defendant has met its burden under the appropriate summary judgment standards discussed below.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In order to prevail on a Motion for summary judgment, the moving party must meet the burden of proving the absence of a genuine issue as to material fact concerning an essential element of the opposing party's claim. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the nonmoving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. If a nonmoving party, however, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, there is no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552, 91 L. Ed. 2d at 273. When this occurs, the moving party is entitled to summary judgment as a matter of law. *Id.* at 322-23, 106 S. Ct. at 2552; *Williams v. Ford Motor Co.,* 187 F.3d 533, 537-38 (6th Cir. 1999).

Additionally, Fed. R. Civ. P. 56(c)(1) sets forth the requirement to support factual assertions as follows:

**(c)** **Procedures.**

    **(1)** *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support that assertion by:

        **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

        **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**C.** **42 U.S.C. § 1983**

**1.** **Generally**

Plaintiff alleges violations of his Eighth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983. Docket No. 1. Section 1983 provides, in part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

Thus, in order to state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988)*, citing Parratt v. Taylor,* 451 U.S. 527, 535 (1981) (overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330-331 (1986)); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155 (1978). The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made

possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49, 108 S. Ct. 2255, *quoting United States v. Classic,* 313 U.S. 299, 326 (1941).

## 2. Eighth Amendment

### a. Generally

The Eighth Amendment provides that:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

U.S. Const. amend. VIII.

The United States Supreme Court has held that the constitutional prohibition of "cruel and unusual punishments" forbids punishments that are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (citations omitted).

In order to establish an Eighth Amendment claim, a prisoner must satisfy a two-prong test: (1) the deprivation alleged must be objectively serious; and (2) the official responsible for the deprivation must have exhibited deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

### b. Deliberate Indifference to Serious Medical Needs

The State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated. *Estelle,* 429 U.S. at 104.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle,* 429 U.S. at 104. This is true "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05.

Not every prisoner's allegation of inadequate medical treatment, however, is a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105. For instance, courts have held that the accidental, inadvertent, or negligent failure to provide adequate medical care does not state such a claim. *Id.* at 105-06 (citations omitted).

Pursuant to Supreme Court precedent, the Sixth Circuit held, in *Hunt v. Reynolds*, that Eighth Amendment deliberate indifference claims must contain both an objective component, "that [plaintiff's] medical needs were sufficiently serious," and a subjective component, "that the defendant state officials were deliberately indifferent to the plaintiff's needs." 974 F.2d 734, 735 (6th Cir. 1992) (citations omitted).

In order to satisfy the objective requirement, the Supreme Court requires that an inmate demonstrate evidence of a current harm or evidence of a medical complaint or condition of confinement that "is sure or very likely to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Under the Eighth Amendment, inmate plaintiffs, must allege, at the very least, unnecessary pain or suffering resulting from prison officials' deliberate indifference. *Id.* (prisoner alleging that he suffered pain and mental anguish from delay in medical care states a valid Eighth Amendment claim).

As for the subjective element, the Sixth Circuit has held that "a determination of deliberate indifference does not require proof of intent to harm." *Weeks v. Chaboudy*, 984 F.2d 185, 187 (6th Cir. 1993). There must, however, be a showing of deliberate indifference to an inmate's serious medical needs. *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988), *citing Westlake v. Lucas*, 537 F. 2d 857, 860 n. 3 (6th Cir. 1976). In fact, "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)

(citations omitted). The inquiry, therefore, according to the Sixth Circuit, is "[w]as this individual prison official aware of the risk to the inmate's health and deliberately indifferent to it?" *Thaddeus-X*, 175 F.3d at 402, *citing Farmer v. Brennan*, 511 U.S. 825, 837, 844 (1994).

### c.     Respondeat Superior

### i.     Southern Health Partners

*Respondeat superior* does not form a basis for the imposition of liability under § 1983; rather, Plaintiff must plead allegations, *inter alia*, that an "official policy or custom was adopted by the official makers of policy with 'deliberate indifference' towards the constitutional rights of persons affected by the policy or custom." *City of Canton v. Harris*, 489 U.S. 378, 387-88 (1989). *See also Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690-91 (1978) (In order to find a governmental entity liable, Plaintiff must establish that (1) he/she suffered a deprivation of a constitutionally protected interest, and (2) the deprivation was caused by an official policy, custom, or usage of the local governmental entity.).

### D.     Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e

A prisoner must exhaust all available administrative remedies before filing a claim under §1983 or any other federal law. 42 U.S.C. §1997e(a). *See also, e.g., White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997); *Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir. 1998); *Wyatt v. Leonard*, 193 F.3d 876, 878 (6th Cir. 1999). The Prison Litigation Reform Act of 1995 provides in pertinent part as follows:

> (a) **Applicability of Administrative Remedies**. No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

> 42 U.S.C. § 1997e(a) (emphasis original).

> Exhaustion is required even if the prisoner subjectively believes the remedy is not

available, even if the state cannot grant the particular relief requested, and even if the prisoner believes the procedure to be ineffectual or futile. *Napier v. Laurel County*, 636 F.3d 218, 222 (6th Cir. 2011). Additionally, the filing of an initial grievance is not sufficient to satisfy the requirements of §1997e(a). Rather, the PLRA exhaustion of prison administrative remedies requires a prisoner to pursue his prison grievance through the final level of administrative appeal. *Hartsfield v. Vidor*, 199 F.3d 305, 306 (6th Cir. 1999). In *Hartsfield*, the Sixth Circuit explicitly stated:

> Even if Plaintiff did file an initial grievance against [defendants], he was required to continue to the next step in the grievance process . . . . We have previously held that an inmate cannot simply . . . abandon the process before the completion and claim that he has exhausted his remedies. . .

The PLRA requires "proper exhaustion," meaning that a prisoner's grievance must comply with the procedural rules and requirements of the prison or prison system in order for the exhaustion requirement to be met. *Woodford v. Ngo,* 548 U.S. 81, 93 (2006). Prisoners must complete the administrative review process in accordance with the applicable procedural rules set by the prison grievance process. *Jones v. Bock,* 549 U.S. 199, 218 (2007). Pursuant to the PLRA, a prisoner's unexhausted claims cannot be brought into court. *Id.* at 211.

When a defendant shows that a plaintiff has not "exhausted all available state administrative remedies," the only remaining question is whether the plaintiff's claims have been brought with respect to "prison conditions" as that term is used in 42 U.S.C. § 1997e(a).

The Sixth Circuit discussed the meaning of the term "prison conditions" as used in 42 U.S.C. § 1997e(a) in *Freeman v. Francis*, 196 F.3d 641 (6th Cir. 1999). In *Freeman*, the plaintiff inmate brought a lawsuit against prison officials claiming that they had used excessive force against him. The lower court had dismissed his complaint for failure to exhaust administrative remedies. On appeal, the plaintiff argued in part that he was not required to exhaust his

administrative remedies because his excessive force claim did not involve a "prison condition" within the meaning of §1997e(a).  The *Freeman* Court stated in part as follows:

> The phrase "action . . . with respect to prison condition" is not defined in § 1997e. Because the question is one of statutory construction, we must first look to the plain language of the statute.  Defendants argue that the term "prison conditions" as used in 18 U.S.C. § 3626(g)(2), which was amended as part of the same legislation as § 1997e, does include claims such as excessive force because it expressly includes "effects of actions of government officials on the lives of confined persons" as well as "conditions of confinement" in defining "prison conditions." . . .  It is generally recognized that when Congress uses the same language in two different places in the same statute, the words are usually read to mean the same thing in both places.

> Moreover, reading the term "prison conditions" to include claims of excessive force finds support in the purpose and legislative history of the Act.  The Act was passed to reduce frivolous prisoner lawsuits and to reduce the intervention of federal courts into the management of the nation's prison systems.  A broad exhaustion requirement that includes excessive force claims effectuates this purpose and maximizes the benefits of requiring prisoners to use prison grievance procedures before coming to federal court.  Prisons need to know about and address claims of excessive force as they would any other claim concerning prison life so that steps may be taken to stop problems immediately if they exist.

196 F. 3d at 643-644 (footnote omitted).

The U. S. Supreme Court has also held that "' 1997e(a)'s exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences."  *See Porter v. Nussle*, 534 U.S. 516, 520, 122 S. Ct. 983, 986 (2002).  As the *Porter* Court stated:

> Beyond doubt, Congress enacted ' 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.  In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. . . .  In other instances, the internal review might "filter out some frivolous claims." . . . And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.
>
> . . .
>
> For the reasons stated, we hold that the PLRAs exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong

122 S. Ct. at 988, 992 (citations omitted, emphasis added).

**E.    The Case at Bar**

**1.    Exhaustion**

As an initial matter, under the reasoning of *Porter* and *Freeman*, Plaintiff's claims in the case at bar fall within the meaning of the term "prison conditions" as used in ' 1997e(a).  He is, therefore, required to exhaust his administrative remedies as set forth in the PLRA.

It is undisputed that the Jail has Inmate Grievance Procedures; that Plaintiff received a copy of the Inmate Handbook, which includes the Inmate Grievance Procedures; and that Plaintiff signed an acknowledgment thereof. Docket No. 38-5, *passim*. It is further undisputed that although Plaintiff filed grievances, he did not appeal any of his grievances to the Sheriff, as required to constitute exhaustion. *Id.*  Accordingly, it is undisputed that Plaintiff has failed to exhaust his administrative remedies as required under the PLRA.   For this reason, the undersigned recommends that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that this action be DISMISSED WITH PREJUDICE.

**2.    Defendant's Motion for Summary Judgment**

Moreover, even if Plaintiff had exhausted his administrative remedies, Plaintiff cannot sustain his claim for deliberate indifference because the undisputed facts establish that, based on the education, training, and experience of Nurse Lowe, PA Dillon, and Dr. Mathews, as well as their review of Plaintiff's medical chart, it is their professional medical opinion that Plaintiff has received extensive, prompt, and appropriate medical treatment for all of his medical complaints and conditions. Docket Nos. 38-2, 38-3, 38-4. Additionally, it is undisputed that all of Plaintiff's medical attention has been within the standard of care, that no act or failure to act by any member of Defendant's medical staff has proximately caused any injury to Plaintiff, that on no occasion was Plaintiff ever at risk of serious harm, and that no member of Defendant's medical staff was

ever indifferent to any complaint that Plaintiff made. *Id.*

### 3.     Plaintiff's Motion for Summary Judgment

As discussed above, Plaintiff's Motion and supporting materials do not comply with either the Local or Federal Rules. Plaintiff did not file a supporting Memorandum of Law, and neither his "Statement of Material Fact," nor his "Unsworn Declaration of Truth (Affidavit)" comply with the Local or Federal Rules.  Plaintiff has failed to adduce any evidence in a form required by Fed. R. Civ. P. 56 to support his claims.

Even if Plaintiff's Motion, "Statement of Material Fact," and "Unsworn Declaration of Truth (Affidavit)" had complied with the Local and Federal Rules, however, Plaintiff would nevertheless be required to have exhausted his administrative remedies prior to filing suit. As discussed above, the undisputed facts establish that Plaintiff has failed to do so. Furthermore, it is undisputed that Plaintiff's Complaint seeks declaratory and injunctive relief, but Plaintiff is no longer housed at the Fentress County Jail, such that his claims are moot.

## IV. CONCLUSION

For the reasons discussed above, the undersigned finds that allowing Plaintiff to Amend his Complaint at this juncture would not only be futile, but it would cause an undue burden on Defendant, as the pending cross-Motions for Summary Judgment and supporting materials have already been filed. Accordingly, Plaintiff's Motion to Amend (Docket No. 42) is hereby DENIED.

The undersigned additionally finds that Plaintiff has failed to exhaust his administrative remedies, as required under the PLRA. The undersigned further finds that even if Plaintiff had exhausted his administrative remedies, there are no genuine issues of material fact and that Defendant is entitled to a judgment as a matter of law.  Accordingly, the undersigned recommends that Defendant's Motion for Summary Judgment (Docket No. 36) be GRANTED and that

45

Plaintiff's Motion for Summary Judgment (Docket No. 20) be DENIED. Thus, the undersigned recommends that this action be DISMISSED WITH PREJUDICE.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**